# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARY E. McINTYRE,          )
                                    )
          Plaintiff,       )
                                    )     Civil Action No. 2:14-cv-00327
v.                               )
                                    )     Judge Mark R. Hornak
KATHERINE ARCHULETA, Director,  )
U.S. Office of Personnel Management,  )
                                    )
          Defendant.     )
                                    )

## OPINION

**Mark R. Hornak, United States District Judge**

This case focuses on whether the Plaintiff was constructively discharged from her job in violation of federal law. The Plaintiff, Mary McIntyre ("McIntyre"), brings claims pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* The Defendant now asks for summary judgment in its favor on those claims.

McIntyre, who is now 83 years old, worked for the U.S. Office of Personnel Management ("OPM") for twenty-nine years in a number of positions and concluded her employment in the position of Customer Service Representative ("CSR"). Her last day of employment was May 31, 2013. The key question in this case is whether McIntyre then retired, or was instead unlawfully pushed out by her supervisor, Jonathan Sosa. The answer to that question depends, in part, on whether the Defendant engaged, as it was obligated to, in the "interactive process" required when an employee requests an accommodation for a disability. The resolution of these issues will determine whether this case may proceed to trial. The Court concludes that if McIntyre's version of the facts is believed and when all reasonable inferences are drawn in her favor a reasonable

factfinder could conclude that McIntyre was constructively discharged contrary to law. Summary judgment must therefore be denied.

## I.     BACKGROUND

The parties agree on most of the relevant facts in this case.[1]  McIntyre began working for OPM on November 14, 1983, when she was 51 years old, and continued to work there until May 31, 2013.  ECF No. 23, at ¶¶ 2–3.  She held a number of jobs with OPM over the years—all of them at OPM's Iron Mountain underground facility located in Boyers, Pennsylvania—and her final position was as a CSR in OPM's Retirement Services section.  *Id.* at ¶¶ 4, 9–10.  As a CSR, McIntyre's job was to answer federal retirement pay and benefit inquiries for retirees and their survivors and representatives.  *Id.* at ¶ 5.  CSRs are required to answer customer inquiries by phone and through written correspondence, making adjustments to pay and solving questions using available forms, explaining forms and documents to customers, and using OPM's computer software to make changes to automated systems in response to customer inquiries.  *Id.* at ¶ 7.  When she was a CSR, McIntyre's supervisor was Jonathan Sosa ("Sosa").  *Id.* at ¶ 6.

McIntyre suffers from three primary medical conditions: Crohn's disease, post-shingles neuralgia, and cancer.  *Id.* at ¶ 12; ECF No. 28, at ¶ 12.  McIntyre became aware of her Crohn's disease when she was in her forties and acknowledged that she could regulate and control it with medication.  ECF No. 28, at ¶¶ 13–14.  As a result, she never notified OPM management of her Crohn's disease, and she never requested an accommodation for it.  *Id.* at ¶ 15.

In the fall of 2011, McIntyre submitted leave documentation to OPM in which she stated that she had been suffering from shingles beginning on September 5, 2011.  *Id.* at ¶ 16.  She sought medical treatment.  *Id.* at ¶ 17.  From mid-September through the end of November 2011,

---

[1] *See* Concise Statement of Material Facts (ECF No. 23), Plaintiff's Response to that document (ECF No. 28), Plaintiff's Statement of Additional Material Facts (ECF No. 29), and Defendant's Response to that document (ECF No. 32).

McIntyre was away from work to recover from shingles, and she was authorized to take various types of leave, including annual, sick, donated, and leave without pay.  *Id.* at ¶ 20.

In May 2012, McIntyre was diagnosed with breast cancer.  *Id.* at ¶ 21.  In an email dated July 2, 2012, Sosa indicated that he was aware of McIntyre's breast cancer and that she had started chemotherapy.  *Id.* at ¶ 22.  McIntyre had breast cancer surgery on September 12, 2012, but after the surgery the cancer continued to spread to her bones.  *Id.* at ¶¶ 23–24.[2]  She underwent another round of chemotherapy.  *Id.* at ¶ 26.  McIntyre testified that during that fall she was very fatigued.  *Id.* at ¶ 27.  From mid-September 2012 through the middle of December 2012, McIntyre was authorized to be away from work, but due to her low remaining leave balance, she had to use leave without pay, and she continued to be protected by the Family Medical Leave Act ("FMLA"). *Id.* at ¶ 28.  McIntyre's treatment for breast cancer continued into 2013, and her physician, Dr. Pathe, indicated that she would require "intermittent days off for treatment, labwork, and MD follow appointments" and that the "[t]reatments can cause increase [sic] fatigue and weakness, and increase [sic] risk of infection which may require intermittent days off also."  *Id.* at ¶ 29.

McIntyre testified that she wanted to work another two years[3] to fund her retirement account, and she returned to work in the middle of December 2012.  *Id.* at ¶¶ 30, 32. Sometime between January 1, 2013 and the end of February 2013, McIntyre requested an accommodation: she wanted to work from home full time.  *Id.* at ¶ 33.  McIntyre says she made this request verbally to Sosa "at or near the fax machine in the department where Plaintiff worked in 2013," but she never filled out paperwork requesting the accommodation.  *Id.* at ¶¶ 34–35.  The parties

---

[2] A year later, McIntyre's physician, Dr. Neeta Pathe, wrote in a letter that her cancer was incurable and that her life expectancy could well be under two years.  ECF No. 23, at ¶ 25; ECF No. 24-5, at 2–3.

[3] While McIntyre stated that "it wasn't going to be realistic [to continue working] because I did not have the energy or the inclination to go in," ECF No. 23, at ¶ 31, she also believed that she could have continued working those two years if she were given the opportunity to work from home, ECF No. 29, at ¶ 120.

disagree about the facts of this conversation. Sosa testified at his deposition that (1) he did not recall McIntyre making such a request, and (2) even if she had, the request would have been denied because of McIntyre's "minimally successful" work performance evaluation for the period of 10/01/2011–9/30/2012. ECF No. 23, at ¶ 36. McIntyre says that Sosa told her that it would take two months to get her set up to work from home. ECF No. 28, at ¶ 36. Moreover, McIntyre says that Sosa never told her that she needed to complete a form.[4]

The parties also disagree about McIntyre's performance. The Defendant presents the following litany, based on the testimony of Sosa: after Plaintiff's return to work, Sosa began receiving numerous phone calls about errors in McIntyre's work; Sosa wrote an email on January 23, 2013 in which he stated he was giving McIntyre an "unacceptable performance" rating, noting that he had "reviewed 83 letters and she had 30 errors giving her a 36.14% error rating," which Sosa opined was a high percentage; in early 2013, McIntyre was not returning phone calls from annuitants; McIntyre was getting backlogged, and her work was being redistributed to other employees; McIntyre had difficulty using her computer and various software systems;[5] McIntyre had difficulty reading her screen, requiring OPM to adjust her monitor and provide her with a magnifying glass; McIntyre had problems completing her production reports, which included inaccurate and incomplete numbers; and McIntyre was nodding off at her desk. ECF No. 23, at ¶¶ 38–46.

While McIntyre admits only that Sosa testified to these things in his deposition, ECF No. 28, at ¶¶ 38–46, McIntyre does admit that she did have certain problems at work: Casey Tynan, McIntyre's cubicle partner, stated that McIntyre was backlogged in her work during the final

---

[4] For reasons that will be made clear in this Opinion, this material difference in each party's version of what took place in this conversation makes a big difference.

[5] McIntyre denies that she had any issues with computer programs; rather, she merely chose not to respond to emails unless they were urgent. ECF No. 28, at ¶ 43.

months of her employment and that she was having a hard time at work physically (evidenced by the fact that she sometimes slept at her desk). ECF Nos. 23 and 28, at ¶¶ 47–49.[6]

In a First Quarter Review in 2013, Plaintiff received an unacceptable performance rating in Customer Service and, pursuant to OPM policy, was placed on a Performance Improvement Plan ("PIP") by Sosa and Human Resources on February 19, 2013. *Id.* at ¶¶ 51–54. Sosa gave the following explanation for why McIntyre's performance was unacceptable:

> From October 1, 2012 to present, I have reviewed the correspondence you have processed and you have required constant intervention, direction and corrective measures. During the timeframe of December 12, 2012 to January 29, 2013, you processed 84 letters. I have reviewed all of the letters and there were 31 errors which is an overall error percentage rate of 36.9%. Many of the letters were returned to you multiple times for corrections. This is an Unacceptable level of performance.

*Id.* at ¶ 56. McIntyre was notified and acknowledged receipt of the PIP on February 26, 2013. *Id.* at ¶ 57. The PIP was set to last 60 days, and Sosa explained to McIntyre what was expected of her during it. *Id.* at ¶¶ 58–59. The parties disagree about whether McIntyre struggled with computer systems: the Defendant says she did and was thus provided with individualized training, ECF No 23, at ¶ 60, while McIntyre denies having computer difficulties, ECF No. 28, at ¶ 43, and says that she was not provided training but "was just showed where [Outlook] was, and how I used it," *id.* at ¶ 60.

The parties do, however, agree that McIntyre continued to have issues at work during the PIP. She struggled with email correspondence, maintained a high overall error rate (between 34% and 41%), failed to place her phone in work mode, causing customer calls to go straight to voicemail, and left a piece of correspondence on her desk despite two emails having been sent to employees requesting that they check their desks for just that document. ECF No. 23, at ¶¶ 61–

---

[6] Casey Tynan also testified that she never witnessed Sosa harassing McIntyre and that OPM management attempted to assist Plaintiff by taking her off of "mail run" or control desk duties. ECF No. 23, at ¶¶ 47, 50.

64. Moreover, during the PIP, McIntyre's workload had to be reduced, her letters had to be audited, she was taken off phone rotation, she was assigned a mentor, and she was absent a number of days, which caused the PIP to be extended to May 21, 2013. *Id.* at ¶¶ 65–66.

By April 2013, McIntyre had exhausted her 480 hours of FMLA Leave and had no other remaining leave time. *Id.* at ¶ 67. At OPM, when leave is exhausted, an employee is permitted to go into leave-without-pay status ("LWOP"), provided that the employee's request for LWOP is supported by medical documentation and leave procedures are followed. *Id.* at ¶ 68. McIntyre often took leave without informing Sosa or submitting a leave slip. *Id.* at ¶ 70. McIntyre was no stranger to leave: in 2001 she took 641 hours of total leave; in 2012 she took 605 hours; and from January 1, 2013 to May 31, 2013, she took 514.9 hours of total leave. *Id.* at ¶ 71. Sosa consulted with HR and issued McIntyre a Notice of Leave Restriction on April 9, 2013. *Id.* at ¶ 72.

From April 11, 2013 through May 14, 2013, McIntyre worked only four days. *Id.* at ¶ 73. On May 14, 2013, McIntyre filled out a retirement application—of which she informed Sosa two days later—and selected May 31, 2013 as her official retirement date. *Id.* at ¶¶ 74–75. The Notification of Personnel Action form lists McIntyre's retirement as voluntary. *Id.* at ¶ 76.

Why did McIntyre retire? Defendant points to McIntyre's testimony that she was out of leave and her statement that "I had to retire for the simple reason that I ran out of time, and they would not give me time." *Id.* at ¶ 77. McIntyre denies any implication that this is the entirety of her testimony on the subject and states that she actually had several additional reasons for retiring, including the following: commuting to work on a bus was difficult for her, she was experiencing fatigue as a result of her cancer and its treatment, and she found the workplace to be highly stressful. ECF No. 28, at ¶ 77 (citing McIntyre's deposition transcript, ECF No. 30-3,

at 14–16).  Defendant acknowledges that McIntyre testified that those reasons contributed to her decision to retire.  ECF No. 23, at ¶ 79.

The parties disagree on another portion of McIntyre's deposition testimony relating to her own perception of her ability to keep working.  Defendant says, "During her deposition, Plaintiff acknowledged that, at the time of her retirement, she was not healthy enough to work, and that she would still not be able to work to this day."  ECF No. 23, at ¶ 80.  McIntyre points out that she elaborated on this statement by saying that, while she did not have the energy or inclination to go into work, she could have continued to do her work from home.  ECF No. 28, at ¶ 80; ECF No. 30-3, at 18–19.  According to McIntyre, she was also having difficulty (and Sosa was aware of this) getting to and from work (she had to commute by bus), which caused her fatigue and contributed to her early retirement.  ECF No. 30-3, at 11.  McIntyre also notes that she had a laptop and internet access at her house.  *Id.* at 20.  McIntyre also points out a number of facts that could suggest that Sosa forced her to retire.  She notes that in October of 2011, shortly after she began to suffer from shingles, she was sent a retirement estimate.  ECF No. 29, at ¶ 121 (citing ECF No. 30-1, at 3–5).  McIntyre says that Sosa and Janet Bass (a member of Retirement Services – Operations, *see* ECF 24-2, at 16) met with McIntyre and decided to give her the retirement estimate as guidance. Then, shortly *before* the PIP was issued on February 19, 2013, Sosa asked McIntyre when she intended to retire.  ECF No. 30-3, at 2.

McIntyre exhausted her administrative remedies, ECF No. 23, at ¶¶ 81–91, and filed this lawsuit on March 13, 2014, *id.* at ¶ 92, in which she alleged disability discrimination (via a hostile work environment and constructive discharge) and retaliation.  After the close of discovery, however, McIntyre consented to the dismissal of her hostile environment and retaliation claims, ECF No. 27, at 10, leaving only the claim of constructive discharge under the Rehabilitation Act of 1973, 29 U.S.C. §701 *et seq.*

On March 13, 2015, Defendant filed a Motion for Summary Judgment. The Court has reviewed the Motion for Summary Judgment (ECF No. 21) and its supporting brief (ECF No. 22); Defendant's Concise Statement of Material Facts (ECF No. 23) and supporting Exhibits (ECF No. 24); McIntyre's Response to Defendant's Motion for Summary Judgment (ECF No. 26) and supporting brief (ECF No. 27); Plaintiff's Response to Defendant's Concise Statement of Material Facts (ECF No. 28), Plaintiff's Statement of Additional Material Facts (ECF No. 29), and supporting Appendix (ECF No. 30); Defendant's Response to Plaintiff's Statement of Additional Material Facts (ECF No. 32); and Defendant's Reply brief (ECF No. 33). The Court heard oral argument on May 13, 2015.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine only if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "In considering a motion for summary judgment, a court must draw all reasonable inferences from the underlying facts in the light most favorable to the non-moving party." *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 162 (3d Cir. 2001). "When there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (alteration and internal quotation marks omitted). "To defeat a motion for summary judgment, the nonmoving party must raise more than some metaphysical doubt as to the material facts, and the court must determine that a fair-minded jury could return a verdict for the nonmoving party on the evidence presented." *Doe v. Luzerne*

*Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011) (internal citations, alterations, and quotation marks omitted).

### III.   DISCUSSION

#### A.  Legal Standard

The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et. seq.*, which applies to federal employers and employers who receive federal funding, "forbids employers from discriminating against persons with disabilities in matters of hiring, placement, or advancement." *Shiring v. Runyon*, 90 F.3d 827, 830 (3d Cir. 1996); *see* 29 U.S.C. § 794(a) (providing, in pertinent part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ."). "The standards used to determine whether the Act has been violated are the same standards applied under the ADA." *Coleman v. Pennsylvania State Police*, 561 F. App'x 138, 143 (3d Cir. 2014) (citing *Emerson v. Thiel Coll.,* 296 F.3d 184, 189 (3d Cir. 2002)).

 "[T]he familiar framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 793–94 (1973), for Title VII cases is equally applicable to discrimination claims under the Rehabilitation Act." *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007). The *McDonnell Douglas* burden-shifting framework requires a plaintiff first to make a *prima facie* showing of discrimination, which shifts the burden to the employer to articulate some legitimate, nondiscriminatory reason for the employment action. *Id.* at 185. "If the defendant meets this burden, the presumption of discriminatory action raised by the prima facie case is rebutted," *id.* (citing *Tex. Dep't. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254–55 (1981)), but the plaintiff "must then be afforded an opportunity to show that the employer's stated reason for the

employment action, such as plaintiff's rejection or separation, was pretextual," *id.* (citing *McDonnell Douglas,* 411 U.S. at 804).

To make out a *prima facie* case under the Rehabilitation Act, a plaintiff must demonstrate the following: "(1) that he or she has a disability, (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job." *Shiring*, 90 F.3d at 831.

To demonstrate pretext, a plaintiff must "cast sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication or allow the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Wishkin*, 476 F.3d at 185 (quoting *Fuentes v. Perskie,* 32 F.3d 759, 762 (3d Cir. 1994)) (alterations omitted). "A plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either '(i) discrediting the employer's proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Id.* (quoting *Fuentes*, 32 F.3d at 764).

### B.  The Parties' Positions

Defendant argues that McIntyre has failed to make out a *prima facie* case of discrimination under the Rehabilitation Act and that she has failed to establish that a reasonable trier of fact could conclude (1) that she was qualified for her position, (2) that her requested accommodation was reasonable, and (3) that she was constructively discharged (i.e., that her

working conditions were made intolerable by the Defendant).[7] ECF No. 22, at 4–11, 16–18. Further, Defendant says that it had legitimate, non-discriminatory reasons for terminating McIntyre and that McIntyre has failed to demonstrate that those reasons were a pretext for discrimination. *Id.* at 21–27. For any one of those reasons, Defendant says, this Court should grant its Motion for Summary Judgment.

McIntyre disagrees. She says there is a genuine issue of material fact about at least (1) whether she was qualified (i.e., whether she could have performed the essential duties of her position if a reasonable accommodation had been provided), (2) whether the Defendant engaged, as required by the decisions of our Court of Appeals, in the interactive process with McIntyre to determine the appropriate accommodation, and (3) whether McIntyre's retirement was actually a constructive discharge that occurred because the conditions of discrimination in McIntyre's employment became so intolerable that a reasonable person would have resigned. ECF No. 27, at 3–12. Further, McIntyre says she has presented evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 13 (quoting *Fuentes*, 32 F.3d at 765). According to McIntyre, there is at least a genuine issue of material with respect to all of the issues raised by Defendant.

### C. Was McIntyre Qualified?

Our Court of Appeals has explained that the determination of whether an employee is qualified is a two part test:

> First, a court must consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc. Second, the court must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation. The determination of

---

[7] There appears to be no dispute that McIntyre was disabled.

whether an individual with a disability is qualified is made at the time of the employment decision.

*Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) (internal quotation marks and citations omitted).

The Defendant concedes the first prong of the qualified individual test for the purposes of its Motion, stating that "it appears that Plaintiff can satisfy the prerequisites of the position." ECF No. 22, at 5 n.3. So it is the second prong that is in dispute here. Defendant says that McIntyre was unable to perform the essential functions of the CSR position, including "spending up to seven hours on the phone each day, producing written responses to customers, and utilizing the computer to navigate through OPM's software systems." ECF No. 22, at 5. Defendant says that McIntyre's cancer and her cancer treatment caused her to be fatigued and weak and "simply too sick to perform the essential functions of her CSR position." *Id.* at 5–6. This is evidenced, Defendant says, by the fact that McIntyre was committing numerous errors at work, had exhausted all available leave, and was so tired she was falling asleep at her desk. *Id.* at 6. Quite simply, Defendant says that McIntyre was too sick to come to work and therefore unqualified for the CSR position.

But McIntyre argues that Defendant has entirely neglected the last part of the second prong of the *Gaul* test—i.e., that an employee be able to perform the essential functions of the job *with or without reasonable accommodation*—and that she would have been capable of performing the job with some reasonable accommodation. ECF No. 27, at 4. Specifically, McIntyre requested that she be permitted to work from home, a solution that would have eliminated her exhausting bus commute and much of the resultant fatigue. Without the problems created by persistent fatigue that was, according to McIntyre, largely caused by her commute, she could have continued to complete her tasks without the performance issues pointed out by

the Defendant: "there is no reason that Plaintiff could not have performed the same duties she had successfully performed for years if she wasn't too exhausted to work." *Id.* at 5.

McIntyre argues (and this Court agrees) that there is at least a genuine issue of material fact as to whether she could have continued to perform the essential duties of her job if she had been given the opportunity to work remotely. *Id.* Certainly, if the Defendant's testimony is credited, there were major, if not disqualifying, problems with McIntyre's job performance. That said, as McIntyre rightly points out, the Defendant's arguments with respect to her qualifications for the position depend on her performance when she was unaccommodated. How would she have done with some accommodation? We don't know because the Defendant never engaged in the interactive process with McIntyre once she requested an accommodation. Therefore, McIntyre has introduced sufficient evidence from which a factfinder could conclude that she has established this element of her *prima facie* case.

### D. Was McIntyre's Requested Accommodation Reasonable?

Which brings us to the requested accommodation itself: was it reasonable? The Defendant says that it was not, or at least that McIntyre has failed to carry her initial burden of making a facial showing that the accommodation was reasonable. ECF No. 22, at 8 (citing *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 401 (2002)). Why, according to the Defendant, was McIntyre's requested accommodation unreasonable? Because, "[p]ursuant to OPM telework policy, only those employees with favorable performance evaluations – at the 'fully successful' level or above – were eligible to work from home." *Id.* McIntyre's performance evaluation for the period that preceded her request for the accommodation, *see* ECF No. 24-5, at 13, rated her as being merely "minimally successful," meaning she did not qualify under the OPM telework policy, ECF No. 22, at 8. The Defendant says that courts do not require employers to grant accommodation requests that would contravene established workplace policy. *Id.* at 8 (citing

*King v. City of Madison,* 550 F.3d 598, 600 (7th Cir. 2008); *Spielman v. Blue Cross and Blue Shield of Kansas,* 33 Fed. App'x 439, 444 (10th Cir. 2002); *Burns v. Coca-Cola Enterprises, Inc.,* 222 F.3d 247, 257 (6th Cir. 2000)).

The Defendant also says that working from home was an unreasonable accommodation under the circumstances because McIntyre's poor performance necessitated extensive supervisory control and interaction with other team members. ECF No. 22, at 9. The Defendant then points out that a number of courts have stated that working from home is rarely considered a reasonable accommodation in circumstances where teamwork and supervision are necessary. *See Rauen v. U.S. Tobacco Mfg. Ltd. P'ship*, 319 F.3d 891, 896 (7th Cir. 2003) ("The reason working at home is rarely a reasonable accommodation is because most jobs require the kind of teamwork, personal interaction, and supervision that simply cannot be had in a home office situation.") (citing *Van Zande v. Wisconsin Dep't of Admin.,* 44 F.3d 538, 544 (7th Cir. 1995)); *Mason v. Avaya Communications, Inc.,* 357 F.3d 1114, 1124 (10th Cir. 2004) (finding the work-at-home accommodation unreasonable for a low-level administrative position that requires supervision and teamwork); *Kvorjak v. Maine,* 259 F.3d 48, 57–58 (1st Cir. 2001) (finding that a call center employee's arrangement for full-time work at home was unreasonable where job required joint problem-solving among team members).

In essence, then, the Defendant is saying (1) that McIntyre was ineligible to work from home because of her low performance scores and (2) that McIntyre's required supervision and teamwork made work from home an unreasonable accommodation. But McIntyre says that, for the purposes of summary judgment, the Court shouldn't even get that far because the Defendant failed to engage in the required interactive process with her at all. In other words, when McIntyre requested the accommodation, the Defendant was required to at least engage in the interactive process with her but failed to do so. On this point, McIntyre is correct.

14

In *Taylor v. Phoenixville School District*, 184 F.3d 296, 311 (3d Cir. 1999), our Court of Appeals set forth the standard for the interactive process required of an employer when an employee seeks an accommodation.[8] The Third Circuit has recognized and applied the EEOC's interpretative guidelines that explain an employer's duty to engage in the interactive process:

> "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the employee with a disability."

*Id.* (quoting 29 C.F.R. Pt. 1630, App. § 1630.9 at 359) (alteration omitted). As part of the interactive process, "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." *Id.* at 312 (quoting *Deane v. Pocono Medical Center*, 142 F.3d 138, 149 (3d Cir. 1998) (en banc)). The *Taylor* court then stated that it agreed with a Seventh Circuit case on the subject:

> "An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer. Both parties bear responsibility for determining what accommodation is necessary. Neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility."

*Id.* (quoting *Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1285 (7th Cir. 1996)) (internal quotation marks and alterations omitted).

An employer's obligation to engage in the interactive process is triggered by an employee's request for an accommodation. *Id.* at 313. Such a request need not be formal or in

---

[8] While *Taylor* involved a claim under the ADA, the court made clear that its reasoning applied equally to cases brought under the Rehabilitation Act. *See Taylor*, 184 F.3d at 312 n.5.

writing; it may be in plain English and does not need to use the phrase "reasonable accommodation." *Id.* But "the notice nonetheless must make clear that the employee wants assistance for his or her disability." *Id.* The essential question is "whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Id.* Once an employee has thus informed her employer of her disability and desire for accommodation, the employer must "make a good-faith effort to seek accommodations."[9] *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 187 (3d Cir. 2009) (quoting *Taylor*, 184 F.3d at 317). Employers can demonstrate good faith in these regards by taking steps such as the following:

> meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome.

*Taylor*, 184 F.3d at 317.

It is no excuse for an employer to argue that it was relieved of its obligation to participate in the interactive process because there was no feasible accommodation that would have made the employee capable of performing the essential functions of her job. *Id.* The reason for this is that "if an employer fails to engage in the interactive process, it may not discover a way in which the employee's disability could have been reasonably accommodated." *Id.* (quoting *Mengine v. Runyon*, 114 F.3d 415, 420–21 (3d Cir. 1997)). As a result, *Taylor* makes clear that summary

---

[9] The *Taylor* court made clear that "an employer who has received proper notice cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation." *Taylor*, 184 F.3d at 317. In this case, the Defendant is essentially arguing that, because it did not consider working from home a reasonable accommodation for McIntyre, it was therefore relieved of its duty to offer, or even consider, other possible accommodations. This is plainly contrary to the instruction of *Taylor*.

judgment should usually be denied in cases where the employer failed to act in good faith during the interactive process:

> When an employee has evidence that the employer did not act in good faith in the interactive process, however, we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect. To assume that accommodation would fail regardless of the employer's bad faith would effectively eliminate the requirement that employers must participate in the interactive process. An employer who acted in bad faith would be in essentially the same, if not better, position than one who participated; that is, both employers would be arguing that the employee failed to find an accommodation making him or her able to perform the essential function of the job. The less the employer participated, the easier this would become, and as a result, the requirement that employers participate in the interactive process would be toothless. Thus, where there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded.

*Taylor*, 184 F.3d at 318.[10]

In order for an employee to demonstrate that an employer failed to engage in good faith in the interactive process, an employee must show the following:

---

[10] Our Court of Appeals has stated in subsequent opinions that there is a limited class of cases in which a defendant who failed to engage in the interactive process may still be entitled to summary judgment. For instance, in *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 233 (3d Cir. 2000), the court reiterated its point that an employer who fails to engage in the interactive process may not discover a way in which the employee's disability could have been reasonably accommodated. At the same time, however, the *Donahoe* court noted that "*Taylor* made it clear that the plaintiff in a disability discrimination case who claims that the defendant engaged in discrimination by failing to make a reasonable accommodation cannot recover without showing that a reasonable accommodation was possible." *Id.* at 234. The *Donahoe* court made clear, however, that "an employer who acts in bad faith in the interactive process will be liable *if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations.*" *Id.* at 234–35 (quoting *Taylor*, 184 F.3d at 317). *Donahoe* thus limits employer liability for failure to engage in the interactive process to situations "where a universe of potential accommodations has been identified." *Id.* at 235. In *Donahoe*, the plaintiff alleged that his employer had failed to accommodate him by offering to transfer him to a position he could perform, but, "after the opportunity for discovery regarding available positions, [he] could not identify any vacant, funded position, at the appropriate level, that he could have performed without presenting a significant safety risk." *Id.* at 229, 235. The case at hand is distinguishable from *Donahoe* primarily because a reasonable factfinder could, on the record facts, conclude that McIntyre might have been able to perform her job with her proposed accommodation of working from home. The Defendant's main objection to McIntyre's working from home was that McIntyre's recent performance evaluations showed poor work performance. But that poor performance was in turn plausibly the result of her disability-generated need for an accommodation. In other words, the Defendant's argument in this regard is circular. The Defendant cannot say that an accommodation was unreasonable when the source of McIntyre's demonstrated need for an accommodation plausibly was the very reason it was denied. Thus, *Donahoe* does not affect the outcome here because McIntyre identified a possible accommodation, and the Defendant nevertheless refused to engage in the interactive process at all. That is not to say that the Defendant would ultimately have been obligated to permit McIntyre to work from home; but it does mean that, once McIntyre identified a possible accommodation, the employer then had an obligation to engage in the interactive process to assess what would have been reasonable, and a factfinder could reasonably conclude that McIntyre would have been able to perform her job with an accommodation. *Id.* at 234–35; *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 772 (3d Cir. 2004).

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Hohider*, 574 F.3d at 187; *Taylor*, 184 F.3d at 319–20.

In this case, a reasonable factfinder could conclude that McIntyre has demonstrated all four elements. First, the Defendant knew of McIntyre's disability. ECF No. 23, at ¶¶ 21–29. Second, there is a genuine issue of fact as to whether McIntyre requested accommodations or help with her disability. The parties' versions of the facts diverge slightly on this point, but there is sufficient evidence from which a factfinder could conclude that McInytre requested an accommodation when she told Sosa in early 2013 that she wanted to work from home. *Id.* at ¶ 33. McIntyre made this request verbally to Sosa, and, though she never filled out paperwork requesting the accommodation, *id.* at ¶¶ 34–35, she was not required to because "[s]uch a request need not be formal or in writing," *Taylor*, 184 F.3d at 313.

Third, there is sufficient record evidence from which a factfinder could conclude that the Defendant did not make a good faith effort to assist McIntyre in seeking accommodations.[11] In fact, there is seemingly no evidence that the Defendant made *any* effort to help McIntyre find an accommodation. Sosa testified at his deposition that he did not recall McIntyre making such a request but that, even if she had, the request would have been denied because of McIntyre's recent "minimally successful" work performance evaluation.[12] ECF No. 23, at ¶ 36. Fourth, McIntyre has demonstrated that it is at least plausible that she could have performed the essential functions of her job with some accommodation. If McIntyre is to be believed, and for the

---

[11] As the term of art "good faith" is used in these circumstances.

[12] In other words, Sosa is saying that he didn't engage in the interactive process with McIntyre because, at least according to his memory, she never made the request—but that if she had requested it, he still would not have engaged in the interactive process with her.

purposes of this summary judgment motion she must be, her performance problems at work resulted from her fatigue, which would have been significantly relieved by working from home and not having to make her long commute. So it is at least plausible that McIntyre could have been accommodated if the Defendant had engaged in the interactive process in good faith. Perhaps the solution would not have been to allow McInytre to work from home full time. Perhaps the parties could have arrived at another solution. After all, "if an employer fails to engage in the interactive process, it may not discover a way in which the employee's disability could have been reasonably accommodated." *Taylor*, 184 F.3d at 317.[13]

McIntyre has thus demonstrated that a factfinder could conclude that the Defendant failed to engage in good faith in the interactive process, and as a result the Defendant cannot avoid possible liability by stating that McIntyre's requested accommodation was facially unreasonable.

### E.  Was McIntyre Constructively Discharged?

The Defendant also challenges McIntyre's *prima facie* case by saying that she failed to establish that she was constructively discharged. The fact that McIntyre has demonstrated that an issue of fact remains as to whether the Defendant failed to provide and accommodation does not necessarily mean that the Defendant could be found liable for constructive discharge.

Our Court of Appeals has explained the following with respect to constructive discharge:

> We employ an objective test to determine whether an employee can recover on a claim of constructive discharge and must therefore determine whether a reasonable jury could find that the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign. *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001). Factors we have found relevant to this issue are whether the employer (1) threatened the employee with discharge or urged or suggested that she resign or retire, (2) demoted her, (3) reduced her pay or benefits, (4) involuntarily transferred her to a less desirable position, (5) altered her job responsibilities, or (6) gave unsatisfactory job

---

[13] Further, the record would also support the inference that the performance issues that the Defendant says would have blocked consideration of her working from home under its policies had their genesis in her disability itself. Therefore, it is plausible that if that disability were reasonably accommodated those performance issues would have been ameliorated.

evaluations. *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993).

*Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502–03 (3d Cir. 2010) (internal quotation marks and alterations omitted).

In this case there is a genuine issue of material fact as to whether McIntyre quit voluntarily or was pushed out by Sosa. The record contains evidence from which, considered as a whole, a factfinder could conclude that McIntyre was constructively discharged:

- In October of 2011, shortly after she began to suffer from shingles, McIntyre was sent a retirement estimate. ECF No. 29, at ¶ 121 (citing ECF No. 30-1, at 3–5). McIntyre says that Sosa and Janet Bass (a member of Retirement Services – Operations, *see* ECF 24-2, at 16) met with McIntyre and decided to give her the retirement estimate as guidance.

- Shortly *before* putting her on a PIP on February 19, 2013, Sosa asked McIntyre when she intended to retire. ECF No. 30-3, at 2.

- McIntyre wanted to work two more years, ECF No. 23, at ¶ 30, and thought she would have been capable of doing so if she had been given the opportunity to work from home. ECF No. 29, at ¶ 120.

- Shortly before her retirement, as part of her first quarter review in 2013, McIntyre received an unacceptable performance rating and was placed on a PIP. ECF No. 23, at ¶¶ 51–52.

Any one of those bits of evidence considered separately may not be sufficient for a factfinder to conclude that McIntyre was constructively discharged, but, on top of all that, the Defendant refused to consider accommodating McIntyre, or to engage in the interactive process with her in order to determine whether a reasonable accommodation was possible. That failure to

engage in the interactive process, on its own, also might not be sufficient to establish a constructive discharge claim, *see Johnson v. Shalala,* 991 F.2d 126, 131–32 (4th Cir.1993) (holding that the elements of constructive discharge are not met by failure to accommodate absent "evidence that the employer intentionally sought to drive [employee] from her position"),[14] but in conjunction with these other pieces of evidence, it creates a genuine issue of fact, *see Pagonakis v. Express LLC*, 315 F. App'x 425, 430 n.4 (3d Cir. 2009) (allowing a plaintiff to assert that her employer's alleged failure to accommodate resulted in her constructive discharge).

Other courts have concluded that a failure to accommodate may be evidence that an employer intended to compel an employee to quit, thus establishing constructive discharge. For example, the Sixth Circuit addressed this situation in *Smith v. Henderson*, 376 F.3d 529 (6th Cir. 2004). The plaintiff in *Smith* pointed to facts in support of her constructive discharge claim that the court said were "normally . . . insufficient to establish a constructive discharge as a matter of law." *Id.* at 534. The court noted, however, that "this case is not the typical constructive discharge case" because the plaintiff "is alleging that the USPS failed to reasonably accommodate her disability as required by the Rehabilitation Act and that the failure-to-accommodate precipitated her involuntary resignation." *Id.* The central issue, therefore, was "whether the USPS's alleged rescission of, or refusal to provide, a reasonable accommodation converted [the plaintiff's] resignation into a constructive discharge." *Id.* The court concluded that it did:

> Assuming that Smith was denied a reasonable accommodation that forced her to work well in excess of her medical restrictions, a jury reasonably could infer that the USPS (through Mullin) knew that Smith's working conditions would become intolerable to a reasonable person suffering from her particular disability. As

---

[14] The *Johnson* court also recognized "that a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge." *Johnson*, 991 F.2d at 132.

noted, Mullin rescinded and/or refused to honor Smith's hours-of-work accommodation that had been in place since 1997, denied Smith the reasonable accommodation of delegating her non-essential accounting duties, and forced her to work long stretches of over-forty-hour weeks with few or no days off, resulting in the foreseeable consequence that Smith's health would markedly deteriorate. Thus, a reasonable jury could conclude that the USPS knowingly and deliberately "turned its back" on Smith and, therefore, the USPS could foresee that Smith would be compelled to quit her job in order to preserve her health.

*Id.* at 537–38.

In this case, McIntyre has alleged that her performance problems were, in a large part, caused by her fatigue that was in turn the result of her long commute. She claims that with an accommodation she would not have had those same problems. It is possible that a factfinder could conclude that the Defendant's refusal to accommodate McIntyre—i.e., its failure to engage in the required interactive process with her—was a substantial part of the reason she was forced to retire. Couple that with Sosa's sending her the retirement estimate, out of the blue, and then inquiring of her retirement plans, along with Sosa's placing McIntyre on a PIP (which contained within it the threat of termination, ECF No. 28, at ¶ 111), and it is plausible that a factfinder would conclude that the Defendant intended to push McIntyre out. Furthermore, a factfinder could also plausibly conclude that, without an accommodation, in McIntyre's specific medical circumstances, the Defendant "permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Colwell*, 602 F.3d at 502.

To sum up, the Court is not saying that McIntyre was constructively discharged; rather, the Court simply cannot at this juncture rule out the reasonable inference that she was. There remains a genuine issue of material fact as to this element. McIntyre has thus made out a *prima facie* case under the Rehabilitation Act.

### F. Pretext

Because McIntyre has established her *prima facie* case, the burden shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for its actions. Here, the Defendant argues that it had just such reasons for all of its actions. It issued McIntyre a Notice of Leave Restriction "to reinforce the discussions Supervisor Sosa had with Plaintiff regarding the appropriate use of leave and to inform her of the guidelines she was expected to follow when submitting future leave requests." ECF No. 22, at 21. McIntyre was put under close supervision—placed on a PIP and assigned mentors—because of her "struggling work performance" and because she "was having difficulty in a multitude of areas that necessitated corrective measures by management." *Id.* at 22. As for the Defendant's denial of McIntyre's request to work from home, "Defendant has stated that such a request was never properly made, and, "[e]ven if it was, Plaintiff would not have qualified for telework given her minimally successful work evaluation, low production, and continued struggles in the workplace." *Id.*

Because the Defendant has articulated a legitimate reason for its actions, the burden shifts back to McIntyre to either discredit the Defendant's proffered reasons, or adduce evidence that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. *Fuentes*, 32 F.3d at 764. To discredit the Defendant's proffered reasons, McIntyre "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the Defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 310 (3d Cir. 2012) (quoting *Fuentes*, 32 F.3d at 765).

McIntyre has met this burden. A reasonable factfinder could reasonably find the Defendant's stated reasons for placing McIntyre on a PIP (i.e., her poor work performance) and for denying her accommodation request were unworthy of credence, particularly in light of the

fact that the Defendant refused to engage in the interactive process with McIntyre when she requested an accommodation that might have remedied precisely the performance issues that the Defendant relied on for its decisions. In other words, the Defendant's refusal to attempt to find a reasonable accommodation for McIntyre is evidence from which a reasonable factfinder could conclude that the Defendant's proffered reasons for its actions should be discredited. McIntyre has therefore demonstrated sufficient weaknesses in the Defendant's explanations for this case to go to trial.

## IV.    CONCLUSION

Because there is a genuine issue of material fact as to McIntyre's claim of constructive discharge under the Rehabilitation Act of 1973, the Defendant's Motion for Summary Judgment is denied.

An appropriate Order will follow.

s/ Mark R. Hornak
Mark R. Hornak
United States District Judge

Dated:  July 29, 2015
cc:      All counsel of record